B. J. FARRAR, Adm'r, v. THOMAS SHEPHERD, et als.

PARTNERSHIP. *Implied settlement.* Where a former partner and brother, having been a book-keeper of the firm, had been in constant correspondence with his brother since the dissolution, had received from him from time to time, a settlement of the accounts between them, had been perfectly satisfied with this settlement, and knew that the balance was against him; upon bill filed to open the accounts, more than twenty years having elapsed since the dissolution of the firm, and nearly that period before filing the bill. *Held,* that the lapse of time would be almost conclusive evidence of satisfactory adjustment between the parties.

Authorities cited : Story on Part., 348; 15 Vesey, 218; Parsons on Part., 524.

---
FROM DAVIDSON.
---

No record can be found in this case.

FREEMAN, J., delivered the opinion of the Court

The original and cross-bills in this case are filed for settlement of the estate of D. G. Shepherd. The main questions in contest grew out of a partnership that had existed from 1839, to January 1, 1852, between the two brothers, James M. and D. G. Shepherd, under the style of D. G. Shepherd & Co. This partnership was in the mercantile business, as its leading object, but seems, ultimately, to have extended to real estate, and pretty well all the property owned by the

parties.    One brother, David G. was a bachelor, and so died; the other a man of family.    There seems to have been the most perfect confidence between the two, and the kindest feelings continued to exist up to the death of James M., in 1867, in the State of Texas. The other brother, D. G. Shepherd, remained in Jackson County, at a place called Granville, until his death, in 1870.    The facts necessary to present the question for decision in this case, may be briefly stated as follows:

David G. and James M. Shepherd commenced business in 1839, in Granville, Jackson County, under the style of D. G. Shepherd & Co.    This firm continued until the 31st of December, 1851, when a formal notice of dissolution was published.    James M., in the mean time, had, in September before this, taken his family and removed to West Tennessee, engaging in mercantile business there, with one Bradbury, at Lexington, Henderson County, and with others at another point on the Tennessee river.    He seems to have made a bad move in this, and to have been unfortunate in his business.    In fact, he seems, from this time on to his death, to have been pressed, and in straitened pecuniary circumstances.    This is evidenced by the fact, that he made frequent calls on his two brothers, David G., and another in Texas, for pecuniary aid, which seems always to have been generously responded to.    David G. remaining at the old place of business, continued prosperous, and having plenty of money, in the language of some of the witnesses in the case.

On the 1st of January, 1852, a partnership was formed between D. G. Shepherd and one Armistead, who, it seems, had been a clerk for the old firm, and trained in business by them. This was done in pursuance of the advice of James M., on his removal to West Tennessee. This firm commenced business in the same house, and took the remaining stock of goods then on hand, belonging to the firm of D. G. Shepherd & Co., invoicing them, and placing the amount to the credit of that firm.

When James M. left for West Tennessee, a considerable amount of debts were due the firm of D. G. Shepherd & Co., and they owed, probably, some debts. On commencing business, the firm of Shepherd & Armistead opened an account on their books with D. G. Shepherd & Co., and also with James M. Shepherd individually. The firm proceeded at once to the collection of the debts due D. G. Shepherd & Co., placing the amounts so collected to the credit of that firm. All sums thus collected, whether arising from mercantile accounts, rents, or any other source, seems to have been carefully entered; and the books most faithfully, no doubt, show the exact state of the facts. From time to time, remittances were made to James M., and these were all charged to his individual account.

In 1858, the firm of Shepherd & Armistead was dissolved, and settled between the parties satisfactorily. D. G. Shepherd at this dissolution, took the assets of the firm, assumed the liabilities, and divided the profits

between himself and partner, as per agreement between them. After this he carried on the business himself, until it was closed by the war, in 1862 or 1863. In the meantime, the account of D. G. Shepherd & Co. was continued on his books, in the same form, as we have indicated it was kept on the books of Shepherd & Armistead, so that, in 1868, there seems to have been to their credit, on this account, as moneys received from all sources, about $15,000.

But the accounts, as between D. G. Shepherd and James M., from 1st January, 1852, to August, 1868, without interest, showed James M. indebted to D. G. $1,594 98 ; with interest as calculated in the account before us, from May, 1866 to 1872, it amounts to the sum of $2,161 20.

In addition to the above, it is proper to state, that, in 1862, and early in 1863, D. G. Shepherd went to Georgia, and at Macon, seems to have purchased cotton, amounting to, perhaps, 110 bales. This cotton was probably bought with Confederate money, realized from his business and collections, and was invested in cotton as the best means of making it sure against the contingencies of the war.

On the part of the representatives of James M. Shepherd, it is maintained that they are entitled to have an account and participation in all the profits of the moneys collected by Shepherd & Armistead, and D. G. Shepherd, as moneys used by the partner, D. G. of the firm, in carrying on trade, after dissolution of the firm, and especially to treat the cotton investment as

13—VOL. 4.

such a transaction, and to share its profits equally with D. G. Shepherd.

It is unquestionably true, as a general principal of law, that, on taking "an account between partners, upon any dissolution, each becomes chargeable with all the debts and claims which he owes, or is accountable for to the partnership, with all interest accruing on the same debts and claims, and with all profits which he has made out of the partnership effects during the partnership, or since the dissolution, either rightfully, or by misapplication;" Story on Part., 348. Or, in the language of Lord Eldon, in a case cited by counsel, 15 Vesey, 218, "to a participation of subsequent profits made by the partners carrying on the trade with the capital as constituted at time of dissolution." But the question is, does this case come within the principles thus laid down, and are there not other facts in this record that prevent the application of the principles cited?

Mr. Parsons, in his work on Partnership, page 524, says, "in regard to the terms of the account and settlement, and the charges, credits, or allowances to be made, it has been conceded by the highest authority, that specific rules are of but little use, because the justice of every case requires that its peculiar facts and merits, the nature of the trade, and the conduct of the parties, and all the various circumstances which affect the rights of the parties, must be taken into consideration in determining what they are or should be;" and Mr. Story lays down the rule in such settlement

that, "if there has not been any stated account, or any positive, or implied settlement at any period, then, of course, the accounts must be taken from the period of the commencement of the partnership.

There has been no formal settlement of the accounts between these brothers is conceded; but is there not one implied, and as definitely assented to by their conduct, as if its forms had been gone through with? We think the proof in this record abundantly sustains this view of the case, and, that the same was so understood by James M. in his lifetime, as well as by D. G. Shepherd. It shows, clearly, that, from time to time, remittances were made by D. G. to James M. before the war; that they were in constant and friendly and confidential correspondence; that, after the war, James M. repeatedly asked money from his brothers. These letters all show, after the war, that this was asked as a brotherly favor, and not claimed as a debt. In some cases he gives the assurance that he will be able to pay the sum back, if prosperous in business, and states his business prospects to his more fortunate brother. In every case his requests seem to have been met with a generous hand. Another brother, who seems to have furnished him considerable sums, and who met him frequently, after the war, giving him aid as far as he could, tells us, that James M. never once spoke of having a partnership interest in Tennessee, or money due him from his brother on that account, or mentioned any interest in Tennessee, except, possibly, the remaining interest in some lands owned

by himself and brother. He says, he feels sure, if such had been the case, James would have mentioned it, and from what we see of their intercourse, we cannot see how it would have been otherwise than as he says. James, as we have said, was in straitened circumstances after his removal to Texas, and was especially depressed in circumstances after the war. He seems to have been struggling hard to get the means of starting in business; was very poor, however, so much as not to have the means, for a time, of getting a home for his family, and had great difficulty in being able to remove them to the point where he had determined to open a business house, in connection with a firm of which he became a member. Under these circumstances, it would be incredible, that while writing frequently to his brother, requesting help from him, as much as he could spare him, in this, his necessity, that he should never have mentioned an interest in the assets left in Tennessee.

The only conclusion we can fairly reach is, that, James M. having been the bookkeeper, of D. G. Shepherd & Co., knew all about the affairs of the firm, had been in constant correspondence with his brother, had received from him, from time to time, a statement of the accounts between them, had been perfectly satisfied with this settlement, knew that the balance was against him, at any rate, that nothing was due him. That the remittances made, were in settlement, and satisfactory to the parties, up to the death of James M., would never have been sought to be

disturbed had he lived, and ought not now to be disturbed after his death, either by his distributees or administrators, who stand in his shoes. The lapse of time in such a case, would be almost conclusive evidence of satisfactory adjustment between the parties, unless there had been fraud, or some other equitable ground on which to open the account, more than twenty years having elapsed since the dissolution of the firm in 1852, and nearly that period before filing this bill. Under such circumstances, it would require a strong case to re-open the accounts, after the death of both parties, and disturb the long acquiesced in state of things, as they were recognized and existed in the understanding of the two brothers, as is clearly shown by their conduct and transactions with each other during this long period.

We, therefore, hold, that the accounts, as they appear up to the death of James M., are to be taken as the state of the settlement between the parties. An account can be had of any matters after this, such as collections made of old debts, or receipts of rents or moneys from sales of lands of the firm. In this will be included rent for occupation of what is known as the Dower land, after the death of James.

This precludes the necessity of any special examination of the question of proceeds of cotton, as our conclusion is, that there was no money of James M., or the firm of D. G. Shepherd & Co., in which James M. had an interest that went into this purchase, and that the cotton was purchased with the money of

D. G. Shepherd, and held by him as his individual property, bound by no trust whatever in favor of James M. or his representatives.

As to any firm property undisposed of, it, as a matter of course, will be shared by the representatives of the partners, and proper accounts had in reference to the same after the death of James. The representative of James M. will have leave, as decreed by the Chancellor, to falsify and surcharge the account by proper proof, if it can be done, in the same way that James M. might have done, if he were alive.

Proper accounts were ordered by the Chancellor in other respects, for the settlement of the estates in litigation, and the rights of the parties. The case will be remanded, with a decree in accordance with this opinion, which is a substantial affirmance of the decree of the Chancellor. Costs of this Court will be paid by appellants, costs below as by decree of the Chancellor.